# EXHIBIT A

1

1    UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
3                    - - -

DONNA M. BECK,                    :
4                                 :
                  Plaintiff(s)    :   Civil Action
5                                 :   No. 04-2199
              v.                  :
6                                 :
MAXIMUS, INC.,                    :   ✍ ORIGINAL
7                                 :
                  Defendant(s)    :
8
                     - - -
9
              Friday, October 22, 2004
10            Philadelphia, Pennsylvania
11                   - - -
12        Oral deposition of DONNA M. BECK, on
13    the above date, beginning at approximately 10:00 a.m.
14    before Louis A. Manchello, Certified Shorthand
15    Reporter (New Jersey Lic. No. XI01418) and Notary
16    Public of New Jersey and Commissioner of Deeds of
17    Pennsylvania, at the Law Offices of Donovan & Searles,
18    1845 Walnut Street, 11th Floor, Philadelphia,
19    Pennsylvania  19103.
                     - - -
20
21
22
23
24

Len Epstein Court Reporting Associates
856-874-0088

```
 1    A P P E A R A N C E S:
                   DONOVAN & SEARLES
 2                 BY:    DAVID A. SEARLES, ESQUIRE
                        1845 Walnut Street - 11th Floor
 3                      Philadelphia, Pennsylvania  19103

 4                        Counsel for the Plaintiff

 5                 SAUL EWING
                   BY:    JAMES A. KELLER, ESQUIRE
 6                      3800 Centre Square West
                        1500 Market Street
 7                      Philadelphia, Pennsylvania  19102-2186

 8                        Counsel for the Defendant

 9                           -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Donna M. Beck                    4

1                           (It was stipulated by and

2                    between counsel for the respective parties

3                    that sealing, certification, and filing

4                    are waived, and that all objections,

5                    except as to the form of the question, are

6                    reserved to the time of trial.)

7                           - - -

8                           DONNA M. BECK, having been duly

9                    sworn as a witness, was examined and

10                   testified as follows . . .

11                          (Whereupon Beck-1 was marked for

12                   identification.)

13                          MR. SEARLES:  We would reserve

14                   the right to read and sign.

15                          MR. KELLER:  For the record,

16                   before we begin, I've pre-marked the

17                   revised Notice of Deposition for today's

18                   deposition as Exhibit Beck-1.

19                          Here is a copy for counsel.

20        BY MR. KELLER:

21             Q.     Good morning, Ms. Beck.

22        A.        Good morning.

23             Q.     My name is Jim Keller, and I represent

24        a company called Maximus, and, as you know, you

1          Q.     So you went to vote and on the voter

2     registration rolls it had two Donna M. Becks?

3     A.          Yes, correct.

4          Q.     You were just asked to clarify which

5     one of the two you were?

6     A.          Yes.

7          Q.     Did you have any problem voting that

8     day?  Were you prohibited from voting, anything like

9     that?

10    A.          I was not prohibited from voting, no.

11         Q.     Did there come a time when you made

12    contact with, for purposes of the deposition I will

13    call her the other Donna M. Beck, who lived on

14    Carver Street?

15    A.          Yes.

16         Q.     When did you first make contact with

17    that Donna Beck?

18    A.          In May of 2003.

19         Q.     Do you recall a date?

20    A.          Early May.  I don't recall the exact date

21    right now.

22         Q.     I will represent to you, and this is

23    not a memory test, that we asked some

24    interrogatories about this, and in your answer you

Donna M. Beck        15

1    said May 2nd, 2003.  Does that sound right?

2    A.          Yes, that sounds right.

3          Q.     How did that contact come about?  Did

4    you contact her?  Did she contact you?

5    A.          I contacted her.

6          Q.     How did you make that contact?

7    A.          I first called her on the telephone, and

8    then I went over to her house.

9          Q.     How did you get her telephone number?

10   A.          I actually, I believe I went on a web

11   site, and I think it was reverseaddress.com, and I

12   put in the address, and it gave me a phone number.

13         Q.     What did you say when you first spoke

14   with her on the telephone?

15   A.          I explained to her first that I was a

16   neighbor, and I told her that I had a problem, then

17   I told her, you know, what my name was.

18         Q.     What did she say?

19   A.          She just pretty much kept saying okay,

20   yes, and she was a little bit confused, I think.

21         Q.     What was the problem as you described

22   it to her that you were having?

23   A.          I told her that my employer had been

24   contacted by Maximus, and I told her that I believe

Donna M. Beck                16

1    it was earlier that same day that I had spoken to

2    Mr. LoBianco at Maximus, who stated that he was

3    going to then cancel a wage garnishment against me.

4            Q.     In that initial conversation did the

5    other Donna M. Beck have any substantive reply to

6    those comments?

7    A.          She said, I think she told me that she

8    knew who Maximus was, and she said something along

9    the lines that she just spoke to them recently.

10           Q.     Did she tell you that she knew what

11   you were talking about when you said "Maximus"?  I

12   mean, did she say anything to indicate she knew what

13   it was you meant?

14   A.          Yes.  She said, "I know who they are."

15   She said, "But why are they calling you?"

16           Q.     Did she say in that conversation, they

17   should be calling me because I'm the debtor or

18   anything to that effect?

19   A.          No, nothing really to that effect.

20           Q.     Did she say anything in that

21   conversation indicating to you that she in fact had

22   a student loan debt?

23   A.          Yes.  When I was over her house, she did

24   mention she had an outstanding student loan.

1           Q.     That's when you were at her house?

2     A.           Yes.

3           Q.     Let's take it one step at a time.   Is

4     that about the sum and substance of the phone call

5     what we've just talked about?

6     A.           Yes.

7           Q.     How long did it last?

8     A.           Less than 5 minutes.

9           Q.     Did you make an appointment during

10    that phone call to come and visit her?

11    A.           Yes, I did.

12          Q.     And when did you go and visit her at

13    her house?

14    A.           An hour to an hour and a half afterwards.

15          Q.     That same day?

16    A.           The same day.

17          Q.     How did you get there?

18    A.           I walked.

19          Q.     How far of a walk was it?

20    A.           About a block.

21          Q.     Do you recall the numbered address on

22    Carver Street that you went to?

23    A.           Yes.

24          Q.     What was that?

1    A.          538 Carver.

2               Q.     How long did it take you to get there?

3    A.          A minute or so, 2 minutes.

4               Q.     Do you know if Carver Street where

5    Ms. Beck, the other Donna M. Beck lived, has the

6    same Zip code?

7    A.          Yes, it does.

8               Q.     19120?

9    A.          Yes.

10              Q.     Was anyone else there when you went

11   and met with the other Donna M. Beck?

12   A.          Yes.

13              Q.     Who else was there?

14   A.          Her children.

15              Q.     Do I take it that you and Ms. --

16   A.          I'm sorry.  And my younger son came with

17   me.

18              Q.     How old is he?

19   A.          He is now 11.

20              Q.     When you were at the other Donna

21   M. Beck's house on Carver Street, is it fair to say

22   that you and she sat down and talked for a while?

23   A.          Yes.

24              Q.     Were there kids involved in the

Donna M. Beck          19

1    conversation, or did they go off and do something

2    else somewhere?

3    A.          They were kind of back and forth.  They

4    were in the room; they were just playing.

5          Q.    Okay.  They were playing.  Who is the

6    oldest child among the children there?

7    A.          The oldest would have been her son, and I

8    believe at the time he was maybe 13, but he was

9    upstairs most of the time.

10         Q.    So we are talking teenagers or younger

11   were present?

12   A.          Yes.

13         Q.    What did you and Ms. Beck, the other

14   Donna M. Beck, talk about while you were at her

15   house?

16   A.          We tried to sort out a little bit of the

17   confusion.  I asked her some questions, just if they

18   ever mentioned -- for instance, I asked her if

19   Maximus ever mentioned Inolex Chemical Company to

20   her.

21         Q.    What did she say?

22   A.          She said no.

23         Q.    Did you and she discuss why it was, at

24   least as the two of you could figure out, that

1    Maximus was calling either of you?

2                         MR. SEARLES:  Object to the

3              form.

4    BY MR. KELLER:

5         Q.    Was there a discussion between you and

6    the other Donna M. Beck about, boy, I wonder why it

7    is that this company Maximus is calling us?

8                         Did you discuss why it was that

9    the phone calls were being made, as best as you and

10   the other Donna M. Beck understood it?

11   A.         I still don't know if I understand what

12   you are saying.

13        Q.    You went to the other Donna M. Beck's

14   house, right?

15   A.         Yes.

16        Q.    To talk about, at least in part, phone

17   calls from Maximus, right?

18   A.         Mm-hmm.

19        Q.    Did you and she theorize or speculate

20   on why it was these phone calls were being made by

21   Maximus during your conversation?

22   A.         We discussed it, but neither one of us

23   could figure out why they called.  She told me, as

24   first -- I explained to her that I was told by

Donna M. Beck          21

1    Catherine Demko that Chris Woods from Maximus had

2    told her that he just spoke to Donna Beck, that he

3    just spoke to me, and that I supposedly told him or

4    that Donna Beck told him that she worked at Inolex

5    Chemical Company.

6                        And I said, I said to her, "Did

7    they even ask you?  Did you say yes?  Were you

8    angry?  Did you just say yes to get them off your

9    back?"  And she stated that she did not.

10                       She told me she told them she

11   was not working.

12                       So then we said, "Well, it

13   doesn't make any sense."  We didn't know why they

14   would be calling Inolex.

15         Q.     Did the other Donna M. Beck during

16   your visit to her house at any point acknowledge or

17   concede that she in fact owed a student loan debt?

18   A.          Yes.

19         Q.     And did she acknowledge or concede

20   that that was why Maximus was calling her?

21   A.          Yes.

22         Q.     Did she tell you during that

23   conversation what her Social Security Number was?

24   A.          No.

1        Q.      Did you ask?

2        A.      No.   I told her what her Social Security

3   Number was.

4        Q.      Explain that to me.

5        A.      I told her that Maximus gave me her Social

6   Security Number and her date of birth.

7        Q.      Do you remember if that Social

8   Security Number, I'm not going to read the whole

9   thing for privacy sake, but I will read the first

10  shift digits, if it was 18850?

11       A.      Yes.

12       Q.      Did she agree that that was in fact

13  her Social Security Number?

14       A.      Yes.

15       Q.      Did the other Donna M. Beck during

16  your visit at her house offer to call Maximus and

17  try to, "I will try to straighten this out for you"?

18       A.      Yes.

19       Q.      Do you know if she did that?

20       A.      I don't know.

21       Q.      What else did you and she discuss

22  during that conversation?

23       A.      You mean like our kids and other --

24       Q.      No.   Other than the fact that, oh, my

1                    And I asked her, "Well, if

2     you're going to toss it, can I have it?"

3          Q.     What did she say?

4     A.        She said, "Here you go," and she handed it

5     to me.

6          Q.     When you saw the document that had

7     been marked as Beck-2, okay, you knew who this Donna

8     M. Beck was, right?

9     A.        Yes, I did.

10         Q.     You had already had the conversation

11    at her house and confirmed that this was the Donna

12    M. Beck who lived on Carver Street, right?

13    A.        Yes.

14         Q.     So you knew this was a mistake, right?

15    A.        Yes.

16         Q.     Prior to your interactions with

17    Maximus, had you had other occasions where someone,

18    a creditor, a credit card company, a loan company,

19    anyone, any kind of company or agency had confused

20    you with the other Donna M. Beck?

21    A.        Yes.

22         Q.     How many times did that happen prior

23    to your dealings with Maximus?

24    A.        I would say two or three.

1          Q.      Tell me as much as you can remember

2     about those two or three instances.

3     A.          Well, most of it is, we had a mixed credit

4     file.

5          Q.      You and the other Donna M. Beck had a

6     mixed credit file?

7     A.          Yes.

8          Q.      What do you mean by that?

9     A.          Meaning when I had gotten my credit report

10    on a couple of occasions, her information, some of

11    her information appeared on my credit report, or I

12    should say, some of what I believe to be her debt

13    appeared on my credit report.

14         Q.      Where did you obtain that credit

15    report from?

16    A.          From Experian.

17         Q.      Have you in fact filed a separate

18    lawsuit against Experian relating to that issue?

19    A.          Yes.

20         Q.      What's the status of that lawsuit?   Is

21    it still active?

22    A.          It's been settled.

23         Q.      Were there, and I've asked your

24    lawyers this, and Mr. Searles may object, but were

1    there any documents, other than your credit report,

2    provided to you by Experian during the course of

3    that lawsuit?

4              MR. SEARLES:  I do object to the

5              form of the question.  Do you mean

6              presented to her personally, or presented

7              to her counsel in connection with the

8              lawsuit?

9    BY MR. KELLER:

10       Q.    Presented to your counsel that you are

11   aware of.

12   A.        None that I'm aware of.

13             MR. KELLER:  David, there is an

14             outstanding discovery request for any

15             documents you got from Experian during the

16             course of that lawsuit.  Were there any?

17             MR. SEARLES:  The short answer

18             is, I don't know.  I wasn't involved in

19             that lawsuit.  I became aware of it only

20             very recently, but I think it's something

21             we can certainly follow up with the

22             Francis and Mailman firm.

23             MR. KELLER:  If you can.  I

24             think there was sort of a blanket

```
 1                    boilerplate objection from Jim, and I'd
 2                    rather not file a motion on it.
 3                         I think it's now clear that it's
 4              relevant.  So if there were documents
 5              produced in that lawsuit that related to
 6              an apparent mix-up between the two Donna
 7              M. Becks, I think we're entitled to them.
 8              There may not have been, but if there are,
 9              I'd like to see them.
10                    MR. SEARLES:  We will certainly
11                 get back to you on that.
12    BY MR. KELLER:
13         Q.    Other than the mixed credit file issue
14    with Experian, were there any other particular
15    instances where it seemed that somebody was
16    confusing you, somebody other than Maximus was
17    confusing you with the other Donna M. Beck who lived
18    about a block away?
19         A.    When I went to vote, they had, it
20    wasn't -- it was two times it happened, that I
21    couldn't tell you when it was, and they did correct
22    the problem, where they scanned signatures from a
23    voters -- whatever signature card you use, and when
24    they scanned in our signatures, they put my
```

1    signature under her address and her signature under

2    my address.

3          Q.    So that got confused on the voter

4    registration rolls?

5    A.          Yes, but I was always allowed to vote.

6          Q.    When you went to the polls, they

7    straightened it out?

8    A.          Yes, I still signed under my address.

9          Q.    Other than the Experian credit files

10   and the confusion at the voter registration booth,

11   have there been other occasions, other than

12   occasions involving Maximus, where someone seemed to

13   be confusing you and the other Donna M. Beck?

14   A.          No.

15         Q.    Was there a time when someone in

16   connection with a car loan appeared to be confusing

17   you with the other Donna M. Beck?

18   A.          That was with the mixed credit file.

19         Q.    Explain that to me.

20   A.          I was denied, based on my Experian credit

21   report I was initially denied.

22         Q.    So let me walk through that with you.

23   You were seeking a car loan?

24   A.          Yes.

```
 1                      MR. KELLER:  Absolutely.

 2                      MR. SEARLES:  I do just prefer,

 3            if you're going to read from a document,

 4            that she be able to read along with you.

 5                      MR. KELLER:  Why don't we mark

 6            it.

 7                      (Whereupon Beck-3 was marked for

 8            identification.)

 9   BY MR. KELLER:

10         Q.    Ms. Beck, I'm going to be asking you

11   questions specifically about Paragraph 33 of this

12   complaint.  So if you want to have it in front of

13   you, that's fine.  Just let me know when you find it

14   and have had a chance to look at it.

15                      MR. SEARLES:  Off the record.

16                      (Discussion off the record)

17   BY MR. KELLER:

18         Q.    Ms. Beck, have you seen the complaint

19   which has now been marked as Exhibit Beck-3 prior to

20   today?

21   A.         Yes.

22         Q.    Did you review it prior to it being

23   filed in this lawsuit?

24   A.         No.
```

1          Q.     When did you first see this complaint?

2    A.          I first saw the complaint yesterday.

3          Q.     So this complaint, if you look at page

4    14, was filed on May 20th, 2004; do you see that?

5    A.          Yes.

6          Q.     Had you seen the complaint prior to

7    May 20th, 2004?

8    A.          No.

9          Q.     And the first time you saw it was

10   yesterday?

11   A.          Yes.

12         Q.     Were you aware at the time this

13   document was filed of the types of damages that were

14   being sought on your behalf in this lawsuit?

15   A.          Yes.

16         Q.     Were you aware that there was a claim

17   being made for injury to your reputation?

18   A.          Yes.

19         Q.     Now that you've had a chance to look

20   at the complaint, are you in fact seeking damages

21   for injury to your reputation?

22   A.          Yes.

23         Q.     Tell me every way in which you think

24   your reputation has been injured by actions of my

Donna M. Beck          52

1    client, Maximus.

2    A.        Most specifically, I think my reputation

3    was hurt when Maximus told the receptionist at

4    Inolex that they were attempting to collect a debt,

5    and that I used two Social Security Numbers.

6             Q.        Who is the receptionist to whom you

7    are referring?

8    A.      .   . She is no longer employed there, but her

9    name. is Janice Del Rossi.

10             Q.        And where do you get the information

11   from about what Maximus allegedly told

12   Ms. Del Rossi?

13   A.        Ms. Del Rossi told me.

14             Q.        Have you ever listened to any tape

15   recording or seen any transcript of any tape

16   recording of that conversation?

17                           MR. SEARLES:   Which

18             conversation?

19   BY MR. KELLER:

20             Q.        The conversation with Ms. Del Rossi

21   that you believe has injured your reputation.

22   A.        No, I never heard that or saw anything.

23             Q.        You don't know what was actually said

24   in that conversation; is that fair to say?

# EXHIBIT B

# MAXIMUS

*HELPING GOVERNMENT SERVE THE PEOPLE*

## MAXIMUS Collection Center

**On Behalf of the U.S Department of Education**
MAXIMUS, Inc.  Telephone: 1-800-863-9025

# Employment Verification Request

USDOE11R

INOLEX CHEMICAL CO
ATTN: HUMAN RESOURCES
JACKSON ST & SWANSON ST

PHILADELPHIA          PA 19148

**Date of Notice:** 05/28/2003
**RE:**  DONNA M BECK
**SSN:**  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

Dear Human Resources:

This request for verification of employment is from Maximus, acting on behalf of the U.S. Department of Education.  Maximus has been authorized by the U.S. Department of Education to collect this information regarding DONNA M BECK, whom our records indicate may be employed by your organization.  Maximus certifies that information obtained by this request will be held as confidential and used solely for the purpose authorized by the U.S. Department of Education. Please complete this verification of employment and return it to the address or fax number listed below.

Employee is currently working here:          Yes ☐          No ☐

Employee is working:                                    F/T ☐          P/T ☐

Employee's Title: _____

Employee's date of hire: _____ Employee's termination date: _____

Does Employee make over Minimum Wage? Yes ☐          No ☐     $ _____ . ___ per hour

Employee's current or last known address: _____

City _____

State _____ ZIP _____

Employee's last known phone number: Area Code      (____) _____-_____

Human Resources point of contact:

Name: _____

Title: _____ Phone: (____) _____-_____

**MAXIMUS Collection Center**
**PO Box 877**
**Grand Rapids MI  49588-0877**
**Phone: (800) 863-9025     Fax: (800) 864-2904**


0000052456

FORM: 11R - (2002/01) EMPLOYER VERIFICATION REQUEST

# EXHIBIT C

CONFIDENTIAL

# MAXIMUS Collection Center

# U.S. Department of Education

# Student Loan Collection
# Standard Operating Procedure Manual

Version:  1.0
January 18, 2001

MAXIMUS00058

CONFIDENTIAL

# MAXIMUS Collection Center

# U.S. Department of Education

# Student Loan Collection
# Training Manual

Version:  1.1
March 28, 2001

MAXIMUS00114

# EXHIBIT D

MAXIMUS

**Q & A**

CONFIDENTIAL

## CHAPTER 3 - Laws and Regulations

### Section 1.1 - Overview of Laws and Regulations
All ED-contract employees of MAXIMUS must adhere to several Federal and State laws governing the collection practices under the ED contract.  This section will cover relevant areas such as the Fair Debt Collection Practices Act and Privacy Act of 1974.  Additionally, certain Federal Statutes regarding the collection of defaulted student loans will be covered.

### Section 2.1 - Fair Debt Collection Practices Act(FDCPA)
The purpose of the Fair Debt Collection Practices Act (FDCPA) is to prohibit abusive, deceptive and unfair debt collection practices by debt collectors.

In summary, the collector may not:
- Harass, oppress or abuse any customer.
- Use threats or coercion.
- Make fraudulent, deceptive representations.
- Threaten to file criminal charges.
- Threaten to seize or sell property.
- Use profane language.
- Make collect calls to customers.
- Make continuous telephone calls or allow telephone to ring incessantly.
- Use credit bureau names deceptively.
- Mail letters to customer's place of business, unless it is marked "confidential".
- Call the customer at unusual times, such as before 8:00 am or after 9:00 p.m.
- Telephone the customer without identifying oneself.

Any person who violates a provision of the Act is guilty of a misdemeanor and upon conviction is punishable by a fine of not less than $100 nor more than $1000 for each conviction.

Customers often allege that ED or its PCAs have engaged in acts or practices that violate the Fair Debt Collection Practices Act (FDCPA) (15 U.S.C. 1692 et seq.) The FDCPA applies only to the collection activities of third-party debt collectors. The statute itself defines the term "debt collector" to exclude officers or employees of the United States, and therefore the FDCPA by its terms does not apply to the collection actions of ED employees. The FDCPA does, however, apply to the PCAs ED retains to perform collection services on student loans. 31 U.S.C. 3718(a)(2)(B).

MAXIMUS00133

MAXIMUS

**Q & A**

**CONFIDENTIAL**

Because the FDCPA does not apply to ED, ED takes the position that it cannot be held liable for any FDCPA violations of its PCAs. In addition, there is a clause in each of ED's contracts with a collection agency that holds ED harmless for the acts of the collection agency.

The following sections will cover the FDCPA in greater detail.

**MAXIMUS00134**

MAXIMUS

CONFIDENTIAL

**Q & A**

**Summary of Sections**

**SS 801 - Short Title (15 USC 1601)**

"This title may be cited as the "Fair Debt Collection Practices Act.

**SS 802 - Findings and Purpose (15 USC 1692)**

"(a) There is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy.

"(b) Existing laws and procedures for redressing these injuries are inadequate to protect credit recipients.

"(c) Means other than misrepresentation or other abusive debt collection practices are available for the effective collection of debts.

"(d) Abusive debt collection practices are carried on to a substantial extent in interstate commerce and through means and instrumentalities of such commerce. Even where abusive debt collection practices are purely intrastate in character, they nevertheless directly affect interstate commerce.

"(e) It is the purpose of this title to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect credit recipients against debt collection abuses.

MAXIMUS00135

MAXIMUS

**Q & A**

**CONFIDENTIAL**

<u>**SS 803 - Definitions (15 USC 1692a)**</u>

"As used in this title"

"(2) The term **'communication'** means the conveying of information regarding a debt directly or indirectly to any person through any medium.

"(3) The term **'consumer'** means any natural person obligated or allegedly obligated to pay any debt.

"(4) The term **'creditor'** means any person who offers or extends credit creating debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another.

"(5) The term **'debt'** means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

"(6) The term **'debt collector'** means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 808(6), such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose which is the enforcement of security interests. The term does not include:

> "(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

> "(B) any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts:

MAXIMUS

**Q & A**

**CONFIDENTIAL**

"(C) any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties;

'(D) any person while serving or attempting to serve legal process in any other person in connection with the judicial enforcement of any debt;

"(E) any nonprofit organization which, at the request of credit recipients, performs bona fide credit recipient credit counseling and assists credit recipients in the liquidation of their debts by receiving payments from such credit recipients and distributing such amounts to creditors; and

"(F') any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

"(7) The term **'location information'** means a credit recipient's place of abode and his telephone number at such place, or his place of employment.

"(8) The term **'State'** means any State, territory, or possession of the United states, the District of Columbia, the Commonwealth of Puerto Rico, or any political subdivision of any of the foregoing.

### SS 804 – Acquisition of Location Information (15 USC 1692b)

"Any debt collector communicating with any person other than the credit recipient for the purpose of acquiring location information about the credit recipient shall:

"(1) identify himself, state that he is confirming or correcting location information concerning the credit recipient, and, only if expressly requested, identify his employer;

"(2) not state that such credit recipient owes any debt;

MAXIMUS

**Q & A**

**CONFIDENTIAL**

"(3) not communicate with any such person more than once unless requested to do so by such person or unless the debt collector reasonably believes that the earlier response of such person is erroneous or incomplete and that such person now has correct or complete location information;

"(4) not communicate by post card;

"(5) not use any language or symbol on any envelope or in the contents of any communication effected by the mails or telegram that indicates that the debt collector is in the debt collection business or that the communication relates to the collection of a debt; and

"(6) after the debt collector knows the credit recipient is represented by an attorney with regard to the subject debt and has knowledge of, or can readily ascertain, such attorney's name and address, not communicate with any person other than that attorney, unless the attorney fails to respond within a reasonable period of time to communication from the debt collector.

### SS 805 – Communication in connection with debt collection (USC 1692c)

"(a) Communication With The Credit recipient Generally: Without the prior consent of the credit recipient given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a credit recipient in connection with the collection of any debt:

"(1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the credit recipient. In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a credit recipient is after 8 o'clock antimeridian and before 9 o'clock postmeridian, local time at the credit recipient's location:

"(2) if the debt collector knows the credit recipient is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the credit recipient; or

MAXIMUS

**Q & A**

**CONFIDENTIAL**

"(3) at the credit recipient's place of employment if the debt collector knows or has reason to know that the credit recipient's employer prohibits the credit recipient from receiving such communication.

"(b) Communication With Third Parties. Except as provided in section 804, without the prior consent of the 'credit recipient given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate in connection with the collection of any debt, with any person other than the credit recipient, his attorney, a credit recipient reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

"(c) Ceasing Communication. If a credit recipient notifies a debt collector in writing that the credit recipient refuses to pay a debt or that the credit recipient wishes the debt collector to cease further communication with the credit recipient, the debt collector shall not communicate further with the credit recipient with respect to such debt, except:

'(1) to advise the credit recipient that the debt collector's further efforts are being terminated;

'(2) to notify the credit recipient that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

'(3) where applicable, to notify the credit recipient that the debt collector or creditor intends to invoke a specified remedy. If such notice from the credit recipient is made by mail, notification shall be complete upon receipt.

"(d) For the purpose of this section, the term 'credit recipient' includes the credit recipient's spouse, parent (if the credit recipient is a minor), guardian, executor, or administrator.

### SS 806 - Harassment or abuse (15 USC 1592d)

A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

MAXIMUS

**Q & A**

**CONFIDENTIAL**

"(1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person".

"(2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.

"(3) The publication of a list of credit recipients who allegedly refuse to pay debts, except to a credit recipient reporting agency or to persons meeting the requirements of section 603(f) or 604(3) of this Act.

'(4) The advertisement for sale of any debt to coerce payment of the debt.

"(5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

'(6) Except as provided in section 804, the placement of telephone calls without meaningful disclosure of the caller's identity.

### SS 807 – False or misleading representations (15 USC 1692)

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

"(1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof.

"(2) The false representation of:
"(A) the character, amount, or legal status of any debt; or
"(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

"(3) The false representation or implication that any individual is an attorney or that any communication is from an attorney.

**MAXIMUS00140**

MAXIMUS

**Q & A**

**CONFIDENTIAL**

"(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

"(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

"(6) The false representation or implication that a sale, referral, or other transfer of any interest in a debt shall cause the credit recipient to:
  "(A) lose any claim or defense to payment of the debt; or
  "(B) become subject to any practice prohibited by this title.

"(7) The false representation or implication that the credit recipient committed any crime or other conduct in order to disgrace the credit recipient.

"(8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

"(9) The use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any state, or which creates a false impression as to its source, authorization, or approval.

"(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a credit recipient.

"(11) Except as otherwise provided for communications to acquire location information under section 804, the failure to disclose clearly in all communications made to collect a debt or to obtain information about a credit recipient, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose.

"(12) The false representation or implication that accounts have been turned over to innocent purchasers for value.

"(13) The false representation or implication that documents are legal process.

MAXIMUS

**Q & A**

**CONFIDENTIAL**

"(14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

"(15) The false representation or implication that documents are not legal process forms or do not require action by the credit recipient.(15 USC 1531)

"(16) The false representation or implication that a debt collector operates or is employed by a credit recipient reporting agency as defined by section 603(f) of this Act.

### SS 808 - Unfair practices  (USC 1692f)

"A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

"(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

"(2) The acceptance by a debt collector from any person of a check or other payment instrument postdated by more than five days unless such person is notified in writing of the debt collector's intent to deposit such check or instrument not more than ten nor less than three business days prior to such deposit.

"(3) The solicitation by a debt collector of any postdated check or other postdated payment instrument for the purpose of threatening or instituting criminal prosecution.

"(4) Depositing or threatening to deposit any postdated check or other postdated payment instrument prior to the date on such check or instrument.

"(5) Causing charges to be made to any person for communications by concealment of the true purpose of the communication. Such charges include, **but** are not limited to, collect telephone calls and telegram fees.

'(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if:
    "(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

MAXIMUS

**Q & A**

**CONFIDENTIAL**

"(B) there is no present intention to take possession of the property;

or

"(C) the property is exempt by law from such dispossession or disablement.

"(7) Communicating with a credit recipient regarding a debt by post card.

"(8) Using any language or symbol, other than the debt collector's address, on any envelope when communicating with a credit recipient by use of the mails or by telegram, except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business.

### SS 809 - Validation of debts (15 USC 1692g)

"(a) Within five days after the initial communication with a credit recipient in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the credit recipient has paid the debt, send the credit recipient a written notice containing:

"(1) the amount of the debt;

"(2) the name of the creditor to whom the debt is owed;

"'3) a statement that unless the credit recipient, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

"(4) a statement that if the credit recipient notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment will be mailed to the credit recipient by the debt collector; and

"(5) a statement that, upon the credit recipient's written request within the thirty day period, the debt collector will provide the credit recipient with the name and address of the original creditor, if different from the current creditor.

"(b) If the credit recipient notifies the debt collector in writing within the thirty day period described in subsection (a) that the debt, or any

MAXIMUS

**Q & A**

**CONFIDENTIAL**

portion thereof, is disputed, or that the credit recipient requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the credit recipient by the debt collector.

"(c) The failure of a credit recipient to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the credit recipient.

### SS 810 - Multiple debts(15 USC 1692h)

"If any credit recipient owes multiple debts and makes any single payment to any debt collector with respect to such debts, such debt collector may not apply such payment to any debt which is disputed by the credit recipient and, where applicable, shall apply such payment in accordance with the credit recipient's directions.

### SS 811 -  Legal actions by debt collectors (15 USC 16921)

"(a) Any debt collector who brings any legal action on a debt against any credit recipient shall:

"(1) in the case of an action to enforce an interest in real property securing the credit recipient's obligation, bring such action only in a judicial district or similar legal entity in which such real property is located; or

"(2) in the case of an action not described in paragraph (I), bring such action only in the judicial district or similar legal entity:
'(A) in which such credit recipient signed the contract sued upon; or
'(B) in which such credit recipient resides at the commencement of the action.

"(b) Nothing in this title shall be construed to authorize the bringing of legal actions by debt collectors.

### SS 812 - Furnishing certain deceptive forms (15 USC 1692)

"(a) It is unlawful to design, compile, and furnish any form knowing

MAXIMUS

**Q & A**

**CONFIDENTIAL**

that such form would be used to create the false belief in a credit recipient that a person other than the creditor of such credit recipient is participating in the collection of or in an attempt to collect a debt such credit recipient allegedly owes such creditor, when in fact such person is not so participating.

"(b) Any person who violates this section shall be liable to the same extent and in the same manner as a debt collector is liable under section 813 for failure to comply with a provision of this title.

### SS 813 - Civil liability (15 USC 1692k)

"(a) Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this title with respect to any person is liable to such person in an amount equal to the sum of:

> "(1) Any actual damage sustained by such person as a result of such failure:
>
> "(2A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or
>
> "(2B) in the case of a class action, (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $300,000 or 1 per centum of the net worth of the debt collector; and
>
> "(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

"(b) In determining the amount of liability in any action under subsection (a), the court shall consider, among other relevant factors:

> "(1) in any individual action under subsection (a)(2)(A), the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance was intentional; or
>
> "(2) in any class action under subsection (a)(2)(B), the frequency and persistence of noncompliance by the debt

---

MAXIMUS

**Q & A**

**CONFIDENTIAL**

collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional.

"(c) A debt collector may not be held liable in any action brought under this title if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

"(d) An action to enforce any liability created by this title may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs.

"(e) No provision of this section imposing any liability shall apply to any act done or omitted in good faith in conformity with any advisory opinion of the Commission, notwithstanding that after such act or omission has occurred, such opinion is amended, rescinded, or determined by judicial or other authority to be invalid for any reason."

### SS 814 - Administrative enforcement(15 USC 16921)

(a) Compliance with this title shall be enforced by the Commission, except to the extent that enforcement of the requirements imposed under this title is specifically committed to another agency under subsection (b).

> 15 USC 5a. -   For the purpose of the exercise by the Commission of its functions and powers under the Federal Trade Commission Act, a violation of this title shall be deemed an unfair or deceptive act or practice in violation of that Act. All of the functions and powers of the Commission under the Federal Trade Commission Act are available to the Commission to enforce compliance by any person with this title, irrespective or whether that person is engaged in commerce or meets any other jurisdictional tests in the Federal Trade Commission Act, including the power to enforce the provisions of this title in the same manner as if the violation had been a violation of a Federal Trade Commission trade regulation rule.

"(b) Compliance with any requirements imposed under this title shall be enforced under 12 USC 131a:

**MAXIMUS00146**

MAXIMUS

**Q & A**

**CONFIDENTIAL**

"(1) section 8 of the Federal Deposit Insurance Act, in the case of:

"(A) national banks, by the Comptroller of the Currency;
"(B) member banks of the Federal Reserve System (other than national banks), by the Federal Reserve Board; and
"(C) banks the deposits or accounts of which are insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), by the Board of Directors of the Federal Deposit Insurance Corporation.

12 U SC 1464, 1730. 12 USC 1425, 1437.
"(2) section 5(d) of the Home Loan Act, by the Federal Home Loan Bank Board acting directly or through the Federal Savings and Loan insurance Corporation), in the case of any institution subject to any of those provisions;

12 USC 1751.
"(3) the Federal Credit Union Act, by the Administrator of the National Credit Union Administration with respect to any Federal credit union;
"(4) the Acts to regulate commerce, by the Interstate Commerce Commission with respect to any common carrier subject to those Acts;

49 USC 1501 note.
"(5) the Federal Aviation Act of 1958, by the Civil Aeronautics Board with respect to any air carrier or any foreign air carrier subject to that Act; and

7 USC 181. 7 USC 225, 227.
"(6) the Packers and Stockyards Act, 1921 (except as provided in section 406 of that Act), by the Secretary of Agriculture with respect to any activities subject to that Act.

"(c) For the purpose of the exercise by any agency referred to in subsection (b) of its powers under any Act referred to in that subsection, a violation of any requirement imposed under this title shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in subsection (b), each of the agencies referred to in that subsection may exercise, for the purpose of enforcing compliance with any requirement imposed under this title any other authority conferred on it by law, expect as provided in subsection (d).

"d) Neither the Commission nor any other agency referred to in subsection (b) may promulgate trade regulation rules or other regulations with respect to the collection of debts by debt collectors as defined in this title.

Q & A

CONFIDENTIAL

### SS 815 - Reports to Congress by the Commission (15 USC 1692m)

"(a) Not later than one year alter the effective date of this title and at one year intervals thereafter, the Commission shall make reports to the Congress concerning the administration of its functions under this title, including such recommendations as the Commission deems necessary or appropriate. In addition, each report of the Commission shall include its assessment of the extent to which compliance with this title is being achieved and a summary of the enforcement actions taken by the Commission under section 814 of this title.

"b) In the exercise of its functions under this title, the Commission may obtain upon request the views of any other Federal agency which exercises enforcement functions under section 814 of this title.

### SS 816 - Relation to state laws  (15 USC 1592n)

"This title does not annul, alter, or affect, or exempt any person subject to the provisions of this title from complying with the laws of any state with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this title, and then only to the extent of the inconsistency. For the purposes of this section, a state law is not inconsistent with this title if the protection of such law affords any credit recipient is greater than the protection provided by this title.

### SS 817- Exemption for state regulation (15 USC 1692o)

"The Commission shall by regulation exempt from the requirements of this title any class of debt collection practices within any state if the Commission determines that under the law of that state that class of debt collection practices is subject to requirements substantially similar to those imposed by this title, and that there is adequate provision for enforcement.

### SS 818 - Effective date (15 USC 1692 note)

"This title takes effect upon the expiration of six months after the date of its enactment, but section 809 shall apply only with respect to debts for which the initial attempt to collect occurs after such effective date. "This title takes effect upon the expiration of six months after the date of its enactment, but section 809 shall apply only with respect to debts for which the initial attempt to collect occurs after such effective date.

MAXIMUS

**Q & A**

**CONFIDENTIAL**

### Section 2.2 - Summary of State Laws
The following table illustrates states laws more restrictive than FDPCA regulation:

| STATE | LAWS MORE RESTRICTIVE THAN FDCPA |
|-------|----------------------------------|
| AL | Can't dun spouse. |
| AK | Use only Licensed Agency Name; register for Alias; agency must make annual financial statement to licensing board |
| AZ | Itemize Debt & Other Charges; Attempt to contact at home first; register for Alias; fingerprinting, financial statements to licensing board. |
| AR | Attempt to contact at home first; "long arm jurisdiction" authorizes state to go after non-resident agencies. |
| CA | Warn of consumer rights/credit damage |
| CO | Itemize Debt & Other Charges; Duns approved by State Administration; Warn of consumer rights/credit damage; register for Alias; receipt for cash payments; written notice to cease; no double damages for violations of both FDCPA and state law. |
| CT | Requires business practice audit; certain names restricted, prohibits creditor use of unlicensed collection agency. |
| DE | NONE |
| DC | NONE |
| FL | NONE |
| GA | Use of Alias is forbidden; requires business practice audit; creditor responsible for collection agency actions. |
| HI | Requires business practice audit; cannot collect agency  fees from debtor. |
| ID | Agency must disclose if related to creditor |
| IL | Use only Licensed Agency Name; agency must maintain a list of aliases used; limits to contact employer are ok with notice; certain names restricted. |
| IN | NONE |
| IA | NONE |
| KS | NONE |
| KY | NONE |
| LA | Application must be sent via USPS |
| ME | Use only Licensed Agency Name;  Duns approved by State Administration; must credit report in client's name. |
| MD | NONE |
| MA | Duns approved by State Administration; ; Warn of consumer rights/credit damage; register for Alias; must credit report in client's name; cannot dun spouse. |
| MI | Use only Licensed Agency Name; Warn of consumer rights/credit damage; register for Alias; receipt for cash payment; certain names prohibited, office restrictions on use of residence/atty. |

MAXIMUS

**Q & A**

**CONFIDENTIAL**

| STATE | LAWS MORE RESTRICTIVE THAN FDCPA |
|-------|----------------------------------|
| MN | Use only Licensed Agency Name; Warn of consumer rights/credit damage; Special Text, Address of State Agency; attempt to contact at home first, register for Alias; receipt for cash payment; autodialers restricted, no message w/neighbor if number is available. |
| MS | NONE |
| MO | NONE |
| MT | NONE |
| NE | Written notice to cease communication. |
| NV | Use of certain names prohibited. |
| NH | Use only Licensed Agency Name; use of alias forbidden. |
| NY | NONE |
| NC | 1 alias only; receipt for cash payment; specific office hours required, forbids sharing office with attorneys. |
| ND | use of alias forbidden. |
| OH | NONE |
| OK | NONE |
| OR | Attempt to call at home first between 6pm-9pm; register of alias. |
| PA | Attempt to call at home first; 1 alias only; mail/visits restricted |
| RI | NONE |
| SC | NONE |
| SD | NONE |
| TN | Special Text, Address of State Agency. |
| TX | Agency maintains list of aliases; certain names prohibited, payment must go to licensed address. |
| UT | NONE |
| VA | NONE |
| VT | Use only Licensed Agency Name. |
| WA | Itemize Debt & Other Charges; Use only Licensed Agency Name; Warn of consumer rights/credit damage; attempt to contact home first; restricted use of certain names prohibited. |
| WV | Use only Licensed Agency Name; cannot use urgent. |
| WI | Use only Licensed Agency Name; register for alias; forbids sharing office with attorneys; no message with neighbor if number is available. |
| WY | Itemize Debt & Other Charges if requested; register for alias. |

MAXIMUS00150

MAXIMUS

**Q & A**

**CONFIDENTIAL**

### Section 3.1 - Privacy Act of 1974
The Privacy Act is a Federal statute that requires a Federal agency to assure access for individuals to certain information held by the agency regarding that individual, and to restrict the acquisition, use and disclosure of that information. The statute is found at 5 U.S.C. 552a.

**Privacy Act applies to:**
- information about individuals
- contained in a system of records
- maintained by an Executive or independent agency - or by contractors on its behalf

The Act applies to individually identifiable information maintained by the Executive and independent agencies of the Federal Government. ED's policy is to protect individual privacy in the collection and use of personally identifiable information while permitting the exchange of records to fulfill ED's administrative functions. This affects the exchange of personal information between the Department and its contractors, the acquisition of that information from the individual and third parties, the release of that information, and the availability of that information to the individual.

Contractor and its employees, and subcontractors and their employees, are treated as if they were Federal employees for purposes of the Act if either maintains a system of records to further agency purposes. Contractors and their employees are required by contract to comply with the Act and the Employee Standards of Conduct, 34 CFR Part 5b Appendix A, and are subject to criminal penalties under the Act for prohibited disclosures. Contractor employees may be "system employees" under Standards of Conduct, and have a higher duty of care with respect to information and records protected by the Act.

### To what information does the Act apply?
1) Privacy Act applies to a "Record" - a collection of information about an individual that:
   a. includes individual's name or other personal identifier, and
   b. reflects a quality of the individual
2) contained in a "System of Records" - a grouping of information

**MAXIMUS00151**

MAXIMUS

**Q & A**

**CONFIDENTIAL**

about an individual that is retrieved by individual's name or other personal identifier

a) A collection of information maintained by an agency is a Privacy Act-protected "record" if-

1. the collection of information contains some quality or characteristic about the individual, including but not limited to the individual's Social Security Number [SSN], education, financial transactions (including financial aid under the HEA), medical history, and criminal or employment history and

2. contains the individual's name, or an identifying number [e.g., SSN], symbol, or other identifier assigned to the individual, e.g., finger or voice print or a photograph.

b) For Privacy Act purposes, "record" means only a record that is in a system of records. Privacy Act "records" includes account information on individuals provided by the Department to contractors. This information remains subject to the Act while in the hands of the contractor.

c) Almost any information about the individual acquired by the contractor directly or indirectly from these records provided by the Department in the course of using that record is Privacy Act-protected. Thus, "satellite" databases created by a contractor using ED Privacy- Act protected records, populated with information from those records, segregated from other contractor records and retrievable by name or SSN may be part of the established system of records.

d) **But:** not all "records" in the hands of the contractor are Privacy Act-protected records: Personal papers of contractor staff or temporary records created by contractor staff regarding the individual are not Privacy Act-protected records if they are:

1) not intended to be retained among the Department's records on that individual

2) not required by contract provisions to be secured, returned or transmitted to the Department, or

3) prepared, maintained or discarded at the discretion of the contractor's employee.

**Cautionary note:** Release of information from informal non-protected records could constitute a disclosure of protected records unless the information released was derived from a source totally independent of the protected records, and was not information that the record-maker obtained to create the protected record. Those records 'are subject to any disposal provisions of the contract, however.

MAXIMUS

**Q & A**

**CONFIDENTIAL**

3) To lawfully establish a system of records, an agency must publish a Notice in the Federal Register regarding that the system. The system notice describes the location of the records, the kinds of records included in the system, the kinds of individuals whose records are included in the system, the purposes for which the records are created, maintained, and used; the authority for the creation of the records; and, most practically, the routine uses authorized for the records contained in that system.

4) Contractor's own records, such as personnel records, that are created by the contractor's management discretion are not included. 34 CFR 5b. 12(c).

5) The Department has organized the records used for collection of student loan and grant overpayment accounts in several systems available to contractors.

**What rights does the Privacy Act give to individuals?**
The Act assures an Individual the fight to:

- access to most of his or her records
- copy or amend own records if not accurate
- appeal denial of request for amendment
- freedom from unauthorized release of records
- sue agency for violation of the Act & get attorney fees and damages

**Agency Responsibilities**
The following are the PCA's responsibilities:

- Collect and maintain only information relevant & necessary to accomplish the function for which the Department is responsible.
- Permit individuals to gain access and correct inaccurate records.
- Collect, to the greatest extent practicable,* information directly from the subject of the record
- Maintain records securely
- Disclose only with subject's consent or, without consent, for specifically authorized or "routine uses."

**Access to the individual**
**Access to the individual:** generally verification of identity is required for access by an individual; for telephone release, the verification is to consist of identifying particulars that parallel the record to which access is sought. 34 CFR 5b.5(b)(v).

MAXIMUS

**Q & A**

**CONFIDENTIAL**

The system notice for each system explains the requirements for verification of identity; the notice for the collection system states; thus access to record (information in records) in the Student Financial assistance Collection System requires:

1) NOTIFICATION PROCEDURE
   If you wish to determine whether a record exists regarding you in the system of records, provide the system manager with **your name, date of birth and Social Security number.** Requests must meet the requirements of the regulations at 34 CFR *5b.5.*

2) RECORD ACCESS PROCEDURES
   If you wish to gain access to a record in this system, contact the system manager and **provide information as described in the notification procedure.** Requests by an individual for access to a record must meet the requirements of the regulations at 34 CFR 5b.5.

**Verification for routine uses compared:** Note that there are no specific requirements in Department regulations for verification of identity of entities or persons identified as potential recipients of protected information as "routine use" information recipients. The Department requires the subject individual at least to present a correct SSN. Secure from any third party (attorney, relative, friend) **requesting information from you** an authorization signed by the subject individual.

**Access and third party telephone inquiries.** Ordinarily information from the record of the individual may not be released without prior written approval from the subject individual. However, the individual has the right to be "accompanied by another person of his choice when he requests access to a record." 34 CFR 5b.5(a). Thus, if the third-party inquiry is made with **the subject individual - as, for example, in a joint telephone call -** the information in the record can be disclosed during the call to the requesting individual in the **presence of his** or her companion. An example of such an inquiry may be lender request for loan balance for a customer who applies for a mortgage or refinancing.

**Disclosure**
"Disclosure" is a release of record [name/ssn and personal characteristic] to a third party. 34 CFR 5b.l(d). A disclosure is a release of information to a party who does not already know the information.

**Disclosure can be with consent of individual, or for generally authorized purposes, or for "routine uses." Consent** must be in writing, signed by individual, naming parties to whom information can be disclosed, and time period allowed.

**Q & A**

**CONFIDENTIAL**

- Attorney retainer agreement not necessarily sufficient to allow disclosure to attorney for the individual.

- **Compare:** FDCPA treats communication regarding debt with spouse or attorney as same as communication to consumer: Privacy Act does not.

**ROUTINE USE**

A routine use is defined using the following parameters:
- A disclosure of a record to a third party by the agency or contractor maintaining the system of records,
- For a purpose that is consistent with purpose for which the information was collected, and
- Within the purposes described in the purpose clause in published system notice.

**Need to Know disclosures among Department or contractor staff:** Although disclosure within the Department, to the contractor, and among contractor staff is a routine use, disclosure may only be made to staff with a need to know the information in the performance of their official duties. 34 CFR 5b.9(b)(1).

The system notice for the **Student Financial Assistance Collection Files** (See Appendix 3) provides some 13 routine uses specific to that system of records, most of which are not typically relevant to contractor use of system records. Pertinent terms of the most typically used routine uses for the Collection Files System include:

(1) **Program Disclosures.** The Department may disclose information from this system to Federal, State, or local agencies, private parties such as relatives, present and former employers and creditors, business and personal associates, guaranty agencies, educational and financial agencies or institutions, consumer reporting agencies, contractors and hearing officials for the following purposes:
    (1) To verify the identity of the applicant;
    (2) to determine program eligibility and benefits;
        *        *        *        *
    (4) to enforce the conditions or terms of the loan;
    (5) to permit servicing, collecting, or accepting the loan;
    (6) to counsel the customer in repayment efforts;
        *        *        *        *
    (8) to locate a delinquent or defaulted customer;
    (9) to issue collection letters;
    (10) to locate a missing customer;
    (11) to collect in-file history information to determine assets and ability to pay;

MAXIMUS

**Q & A**

**CONFIDENTIAL**

(12) to determine last known address;
(14) to prepare for litigation or to litigate collection service and audit;

(17) to verify death;
(18) to conduct credit checks; and
(19) to investigate complaints, update files, and correct errors.

**Disclosure for purpose consistent with purpose collected:**
Note that the disclosure must be **both** for a purpose that falls under a "routine use" **and** at least compatible with, if not expressly within, the purpose for which the information was gathered.

A release of protected information to "relatives," "creditors" and "financial institution" is generally authorized for records in the SFA Collection Files system. However, other inquiries from those same parties may not be consistent with the purposes for which the information was gathered by the Department from the customer. For example disclosure to these parties of requested information cannot be justified under the routine uses, when requested in the following:

- an inquiry from a mortgage lender seeking information within the record that is relevant to its own credit assessment (e.g., income reported or debt burden already incurred by the debtor/mortgage applicant);
- an inquiry from a trade creditor (e.g., a hospital or credit card company) seeking information relevant to its own delinquent debt;
- an inquiry from a spouse seeking financial data regarding the debtor for purposes of a divorce or support lawsuit.

**Debt collector note:** Unlike under the FDCPA, the Privacy Act treats a release to a representative of the subject (e.g., attorney, parent, spouse), as a disclosure, not a release (or communication) with the subject individual.

**Subpoenas:** Information or records are often sought by various parties by means of subpoenas directed to the Department staff or a contractor. The regulations authorize release of records pursuant to an "order of a court of competent jurisdiction." 34 CFR 5b.9(10). Because **subpoenas in civil suits are issued** by a clerk or an attorney and **not** by a judge, a **subpoena is not** considered an order of a court **within the meaning of this provision.**

**MAXIMUS00156**

MAXIMUS

CONFIDENTIAL

**Q & A**

**Contractor staff may <u>not</u> honor a subpoena seeking protected information. The contractor should refer the subpoena to Department staff for response by the Office of General Counsel. If immediate response must be made by the contractor, the contractor should assert that Federal law bars release of the information sought.**

**Law enforcement agencies,** on the other hand, can obtain protected information, upon proper request to the Department. Contractors should refer grand jury subpoenas and other demands for records from Federal, State or local law enforcement authorities to the Department, but these may ultimately be honored.

**Collecting information**
Inform individual when collecting information:
- authority for collecting principal purpose
- routine uses to be made, and
- effect of not providing the information

**Collect** and retain only information that is **pertinent** to the **purpose** of the system of records and the functions for which the system is to be used.

**Collect from the individual.** The Act requires the Department and contractor staff to attempt to collect information directly from the individual to the extent "practicable" where the information may affect the individual's rights under a Federal program. 34 CFR 5b.4(a)(2). However, the kind of information that may be realistically and reliably obtained from the individual directly may differ depending on the inquiry. Unless there is good reason to believe that the individual will not provide reliable information, therefore, the information must be sought from the individual first.

**Explaining authority and purposes:** Explain purpose of collecting the information when seeking information from subject individual.
- Have copy of the system notice readily available; provide a copy to individual who wants more detailed explanation. The purpose for which information was collected varies depending on the information.
- Explain whether providing this information is mandatory or voluntary, and the effect of refusal to provide the information. 34 CFR 5b.4(a)(3).
- **"Mandatory"** provision of information is required under threat of penal sanction.
- **"Voluntary"** provision of information is useful for Department **purposes or needed for a debtor to obtain a benefit or relief.**

---

# MAXIMUS

**Q & A**

**CONFIDENTIAL**

Examples: boilerplate statements vs. oral requests:

- **Education forms:** Education typically includes a written statement of the authority for seeking the information, the principal purpose of the record in which the information would be maintained, and the routine uses for the information, and whether providing the information is mandatory or voluntary.
- **Oral information gathering:** develop a script that briefly summarizes these points: e.g.:
  1) Authority for seeking information: Title IV of the Higher Education Act of 1965, as amended
  2) Principal purpose for obtaining and using the record: To permit servicing and collection of the loan or grant.
  3) Information not required, but failure to provide will prevent Education from [arranging reasonable and affordable payments or other appropriate action].

**Debt collector note:** Note the similarity between the "debt collection purpose" warning required by Fair Debt Collection Practices Act (15 U.S.C. 1692e(11) and the disclosure required by the Privacy Act. The FDCPA limits communication with third parties, requires consent of the debtor/subject in instances in which Privacy Act does not, and will affect how and whether the contractor may inform third-parties regarding the purpose of the inquiry. 15 U.S.C. 1692c(b). Coordination will be useful between written information requests and telephonic follow-up that can refer back to an explanation already provided in written form.

**Collecting information from third parties:** These Privacy Act "intended purpose" disclosure requirements do not apply to information requests made to third parties. However, some court rulings have restricted use of information gathered by an agency from third parties to which the agency did not provide this explanation when it obtained the information. Whether an "intended purpose" statement is needed in fact will vary with the nature of the request and the party to whom the request is made. Some requests are made for self-evident purposes (e.g., asking the attorney for the debtor for copies of bankruptcy filings); the intended purpose of other information requests may be ambiguous (e.g., asking the physician to whom the debtor refers to confirm that he or she has treated the individual). One solution in situations like the latter is to secure the debtor's express consent to disclose the purpose of the inquiry.

MAXIMUS00158

MAXIMUS

**Q & A**

**CONFIDENTIAL**

**Security and accounting obligations**
- Establish and maintain adequate safeguards
- Keep accounting of disclosures

**Safeguards: System notice** establishes the specific security standards and procedures required for access to the records in the system. The system notices for the Student Financial Assistance Collection Files System provides:

1) **Physical access:** "All physical access to... the sites of Department contractors where this system of records is maintained, is controlled and monitored by security personnel who check each individual entering the building for his or her employee or visitor badge."

2) **Computer access:** "The computer system employed by the Department of Education offers a high degree of resistance to tampering and circumvention. This security system limits data access to Department of Education and contract staff on a **"need to know"** basis, and controls individual users' ability to access and alter records within the system. All users of this system of records are given a unique user ID with personal identifiers. All interactions by individual users with the system are recorded."

**E-mail security**: Transmission of un-encrypted Privacy-Act protected information via Internet e-mail is considered by cognizant Federal agencies to be prohibited by the Privacy Act. The Department does not yet have an Internet e-mail security standard.

**System employees higher duty of care:** Department and contractor employees whose official duties require that they refer to, maintain, service, or otherwise deal with systems of records are designated "system employees" and have a higher standard of care required under the standards of conduct. System employees must:

1) (a) Be informed with respect to their responsibilities under the Act;

(b) Be alert to possible misuses of the system and **report to their supervisors** any potential or actual use of the system which they believe is not in compliance with the Act and regulation;

(c) Make a disclosure of records within the [contractor] only to an employee who has a legitimate need to know the record in the course of his official duties;

(d) **Maintain** records as accurately as practicable.

(e) **Consult with a supervisor** prior to taking any action where they are in doubt whether such action is in conformance with the Act and regulation.

MAXIMUS

**Q & A**

**CONFIDENTIAL**

(2) Systems Employees shall not:

(a) Disclose in any form records from a system of records except (1) with the consent or at the request of the subject individual; or (2) where its disclosure is permitted under 5b.9 of the regulation.
(b) Permit unauthorized individuals to be present in controlled areas. Any unauthorized individuals observed in controlled areas shall be reported to a supervisor or to the guard force.
(c) Knowingly or willfully take action which might subject the Department to civil liability.

**Accounting for disclosures:** "Accounting" obligation: The Department and the contractor must record every disclosure of a record, except disclosures intra-agency or disclosures by contractor to the Department itself. "Disclosure" is a release of record [name/ssn & personal characteristic] to third party. This "Accounting" record must be sufficient both to explain what was released and to whom it was released, and to permit any erroneous information previously released to be corrected. 34 CFR 5b.8(a)(3).

- "Accounting" includes making a written or electronic record of the following: Date, nature, purpose of each disclosure. Name and address of entity or person to whom the disclosure was made
- "Accounting" record must be retained by Department for 5 years or the life of the record. 34 CFR 5b.9(c). DMCS Letter history screen should suffice for written disclosures made or accompanied by a system letter, so long as the letter is self-explanatory. Otherwise release should be recorded on L 102 notepad.

**Civil Penalties & Damages**
Civil Remedies against agency for:
- Failure to permit an individual access to records in order to correct or amend individual's record
- Willful or intentional violations for failure to:
  1) keep accurate, relevant, complete, timely records
  2) keep accounting of disclosures
  3) comply with any other provision of Privacy Act
- Court costs and attorney fees
- Damages of $1,000 or more
**See: Employee Standards of Conduct**

**Criminal Penalties**
Agency employees, and contractors and employees of contractors, commit a misdemeanor and may be fined up to $5000 for
- knowing and willful prohibited disclosure of information
- knowing and willful request for, or obtaining, record from an agency under false pretenses

# MAXIMUS

**Q & A**

**CONFIDENTIAL**

## Section 3.2 – Summary of Privacy Act of 1974
*How does The Privacy Act of 1974 affect me at MAXIMUS?*

### Background
Originally, Federal agencies could not use private collection agencies to collect on delinquent or defaulted taxpayer debts. 'Taxpayer' means the general population. This was because employees for PCAs were civilian and not Federal employees. The Privacy Act regulates the exchange and use of information for every citizen and permanent resident alien in the U.S. Access to information considered 'private' (meaning name, address, SSN, tax records, etc.) had never been allowed.

### Federal Employees for Privacy Act Purposes
Federal agencies also realized that the expertise for debt collection was available through PCAs and that they themselves could not collect debt as effectively. Therefore, the provisions of the Privacy Act were made applicable to those civilian PCA employees, if they were allowed to collect on Federal taxpayer debt. This means,

"*You are considered an employee of the Federal government, only for purposes of the Privacy Act.*"

This gives Federal agencies the right to prosecute those PCA employees and the PCA itself, for willful, unauthorized disclosure of information covered under the Privacy Act. It is this application of the Act which allows PCAs to be able to collect Federal debts for the government agencies like the US Department of Education and the Department of Treasury.

### Information Covered
The Privacy Act supports the constitutional right to privacy in the United States. This means that the Federal government is required to protect the information (***system of records***) it maintains on its citizens without allowing general access to those who do not have a ***need to know.*** For us at MAXIMUS, information is the customer account details provided by ED when accounts are placed for collection. This information includes:

- Customer name
- Customer address
- Customer telephone number
- Customer Social Security Number
- Customer Employer Information
- Customer School and Loan information
- Customer payment information
- Customer Treasury Offset Information (covered separately through the IRS Non Disclosure Act)

**MAXIMUS00161**

MAXIMUS

**Q & A**

**CONFIDENTIAL**

- Information developed to collect the debt, like skiptracing information found by MAXIMUS or its subcontractors
- Information contained in the customer's credit bureau report, obtained for the purpose of collecting the debt
- Information found on the ED system of records, or information developed by MAXIMUS to update or maintain this system of records cannot be released without the proper authorization or need to know.

### Need to Know

Almost everyone can remember the news coverage during the 1992 presidential election campaign where Bill Clinton's passport information was released to the general public through various news media. Someone in the State Department released this information. An independent IG investigation showed that two employees of the State Department were "curious," about Bill Clinton's activity in England during the Vietnam War and therefore checked out his passport entries.

The 'need to know' requirement applies to information that ED gives all of us access to. It means that if you release or obtain information regarding a customer, you should have a specific reason which, in our case means, it must help you collect or resolve the debt for that particular customer. **Curiosity regarding a customer is NOT ENOUGH!**

Incidentally, the two State Department employees served time in Federal prison for violation of the Privacy Act.

### Maintaining System of Records

We are required to update and use customer information to collect on these debts. This includes updating customer conversation, name changes and address information. It also includes ensuring that the balance information is accurate (since our system calculates the balances). But MAXIMUS is NOT allowed to change balance, loan or payment information. ED is entirely responsible for these actions. MAXIMUS employees should notify ED if such changes are necessary.

### Release of Information

Information can be released to the customer – it is the customer's right to know. You may also release information to the customer's authorized representative upon receiving consent from the customer. *Skiptracers* may release that part of the information required and relevant during skiptracing activity to obtain location information on the customer. But at no point in time (and the FDCPA is also clear in this regard) should a skiptracer release customer debt information or the purpose of your call to third parties.

MAXIMUS

**Q & A**

**CONFIDENTIAL**

***Information obtained*** during skiptracing is immediately considered covered under the Privacy Act. This means that even though MAXIMUS developed this information, it was done to *maintain the system of records,* and therefore becomes part of this record. MAXIMUS employees MAY NOT release information to other vendors of credit information data.

MAXIMUS00163

MAXIMUS

**Q & A**

**CONFIDENTIAL**

### Section 4.1 - Federal Statutes
This section will highlight all Federal statutes pertaining to the ED Contract.

### Section 4.2 - Statute of Limitations
Section 3 of the Higher Education Technical Amendments of 1991, P.L. 102-26 eliminates any statute of limitations that has applied to enforcement actions to collect student loans made or insured under Title IV of the ILEA. The amendment provides that a lawsuit may be commenced, a judgment enforced, or a garnishment or offset action taken by the Federal government to collect defaulted loans regardless of any Federal or State statute of limitation that might otherwise have applied to these collection actions. The new law also applies to actions by institutions and guaranty agencies to collect defaulted student loans.

Prior to this 1991 amendment, the limitation period for suits to collect student loans made or guaranteed under Title IV of the HEA was six years commencing from the date the government paid a guarantee claim for FISLs, [See U.S.v. Bellard, 674 F.2d 330] or, under 484A(a) prior to that amendment, for six years from the date the loan was assigned to ED for GSLs and for Perkins/NDSLs. [484A(a) of the I-HEA, 20 U.S.C. 1091 a(a)(4) (1990; since amended by P.L. 102-26 ,supra). U.S.v. Menatos, 925 F.2d 333 (9th Cir. 1991)] This new law amends Section 484A to expressly abrogate these prior limitations for each of these kinds of loans. The amendment provides that litigation may be commenced, a judgment enforced, or a garnishment or offset action taken by Federal government to collect defaulted loans regardless of any Federal or State Statue of limitation that might otherwise have applied to these collection actions.

A commonly encountered defense raised in the face of this new authority is the claim that prior limitation periods had expired, rendering the loan judicially unenforceable under the new law. Both the statutory terms governing the effective date of the 1991 amendments and the case law forcefully reject this claim. The effective date provisions of the law expressly provide that this new authority applies to all "pending actions" to collect loans whenever those loans were made, including loans made before April 9, 1986, the date of enactment of the prior version of 484A.

The amendment therefore empowers the government to collect ED-financed loans time-barred under other limitation provisions that previously applied. Although this retrospective, resuscitative effect may appear unusual, Congress has the power to revive time-barred claims because statutes of limitations are procedural rules, and can be established, modified, enlarged, or eliminated by the jurisdiction under which a debt is enforced, without violation of a defendant's

# MAXIMUS

**Q & A**

**CONFIDENTIAL**

constitutional or statutory rights.

**Summary**
In general, debts established within the United States with express or implied contracts cannot be enforced seven years from either the date of the last payment or last acknowledgment of the debt by the customer.

The United States Congress using the 'best interest of the Government' clause and the principle of the Deficit Reduction Act, eliminated the Statute of Limitations with retroactive effect on all debts owed by consumers and businesses to the United States.

During conversation with customers or attorneys, you will be required to speak with authority regarding the elimination of the Statute.  The fact that a time-barred debt can be collected, litigated or garnished is not a violation of constitutional or statutory rights.

**Section 4.3 - Freedom of Information Act**
The purpose of the Freedom of Information Act (FOIA) is to provide the general public the right to access government data and information. The general public may examine records and documents that the government stores and accumulates within the rules and guidelines set forth by the FOIA.

However, in the disclosure of such information there are nine exemptions. One of these exemptions is ,for records, the disclosure of which, would constitute a clearly unwarranted invasion of personal privacy. ED may choose to exercise this exemption. In exercising this exemption, we may look to the motives of the requester and balance his or her right to know against the privacy rights of the individual to whom the records pertain.

The collector may not make a disclosure regarding a customer to a third party or to the general public when requested under the FOIA. People making requests for information under the FOIA should be instructed to put their request in writing. All requests for information under the FOIA must be immediately forwarded to the ED contract monitor.

**Section 4.4 - Defense of Infancy**
The defense of infancy is an argument that the signing of a contract by a minor would not create a binding obligation.  The defense of infancy is no longer a valid defense against collection of a student loan by virtue of Section 484A(b)(2) of the Higher Education Act of 1965 (20 U.S.C. 1091a(b)(2)).

MAXIMUS

**Q & A**

**CONFIDENTIAL**

### Section 4.5 - Collection Costs (COBRA)

Section 484A(b)(1) of the HEA, 20 U.S.C. 1091 a (b)(1), provides in pertinent part, "Notwithstanding any provision of State law to the contrary...a customer who has defaulted on a loan...shall be required to pay...reasonable collection costs." This provision enacted in section 16033 of the **Consolidated Omnibus Budget Reconciliation Act (COBRA)**, Pub. L. 99-272, April 7, 1986, applies with respect to all loans, whenever made. Promissory notes for many student loans contain terms obligating the customer to pay collection costs as well (***NOTE:  Some late fees may have been charged by the prior holders, and if so, are included in the balance which is not already paid).***

Collection contractors charge ED a contingent fee (generally about 20% of amounts collected) for any payments made by the customer on a loan placed by ED with that contractor. ED passes that cost on to the customer (***NOTE:  ED has used this authority to pass collection costs on to customers only after 1986, and only those costs incurred after the change in law).***

Because ED applies customer payments first to defray collection costs, the outstanding balance owed on the loans is holds consists almost exclusively of unpaid principal and accrued interest.
***(NOTE:  ED's computer records display a payoff amount for each loan currently placed with the PCA.  This amount includes both the unpaid principal and interest accrued through the date on the calculation, but an estimate of the amount of the contingent fee cost ED will incur, and pass on to the customer, if that full principal and interest amount were to be repaid immediately- displayed as "projection collection agency fees".  These fees are actually earned and charged to the customer only as the customer makes payments on the loan).***

Some customers, after paying amount equal to their initial outstanding principal and interest, mistakenly contend that their debts are satisfied. Although ED demand letters explain how payments are credited first to costs, these customers either misunderstand or dispute ED's authority to do so. As a practical matter, the amounts owed on loans referred to U.S. Attorney's Offices for collection consist almost entirely of unpaid principal and accrued interest. This dispute may present itself on these referred loans by way of an argument that ED had no authority to apply the payments to costs, and that the amount already paid by the customer should have reduced or satisfied the debt referred for litigation.

Currently, ED accesses a **one-time collection charge of 25%** based on the account's principal and interest.

MAXIMUS

**Q & A**

**CONFIDENTIAL**

### Section 4.6 - Fair Credit Reporting Act

The U.S. Department of Education's computer contractor sends tapes to national credit reporting agencies on a monthly basis. Account balances are updated, and those accounts that have been paid in full or settled in full are reported as a "Paid Collection Accounts." ED will not remove an account from credit reporting unless the account was reported in error. The collector must not indicate to the customer that the information will be deleted or revised. Accounts that are paid through loan consolidation will also be reported as "Paid Collection Accounts." The account however, will be removed from credit bureau report if the account is paid through loan rehabilitation.

Customers who have a dispute with the information that is shown on their credit report should file a dispute with the Credit Reporting Agency that is showing the incorrect information. If necessary, that Credit Reporting Agency will contact ED for updated or corrected information. ED currently reports to TransUnion, Equifax, and Experian.

Customers occasionally file complaints related to the reporting of their defaulted ED-financed loans to credit bureaus. Also, customers often try to condition repayment on the removal of information concerning their defaulted loan from their credit report.

Under section 430A (for FISLs, GSLs, and other GSLP loans) and section 463 (for NDSLs) of the HEA (20 U.S.C. 1080a and 1087cc), ED, lenders, and guarantee agencies ate required to report information on defaulted loans to credit bureaus. Under agreements with the credit bureaus, ED may request that this information be deleted from a customer's credit report only if it is inaccurate. If the customer repays a ED-financed loan, that repayment will be reported, but the information regarding the customer's prior default status on the loan will not be deleted.   Obviously, potential credit-extenders would give little credence to a credit bureau that permitted creditors to remove evidence of default from the records of the bureau when doing so would help that prior creditor.  The credit reporting agreement and common practice rely on the commitment of each creditor to fully and truthfully report the credit history of the customer. Thus, AUSAs should not agree to a settlement that involves the deletion of information concerning a defaulted student loan from a customer's credit bureau report unless that information is incorrect.

Under a specific exception to the limitations periods contained in the **Fair Credit Reporting Act (15 U.S.C. 1681 (c)(4). (6))** the HEA permits credit bureaus to disseminate information on student loan defaults for at least seven years. **For GSLP** loans first reported to a credit bureau before October 1, 1985, the seven year period is measured from the date ED or the Guaranty Agency paid a claim to the

MAXIMUS

**Q & A**

**CONFIDENTIAL**

holder of the guarantee [20 U.S.C. 1080a(f)(l )]. **For GSLs** first reported after October 1, 1985, the seven year is measured from October 1, 1985(or until September 30,1992) [20 U.S.C. 1080a(f)(2)]. **For Perkins loans**, the seven year period is measured from the date ED accepted an assignment or referral of a loan, or if the account has not been previously reported by any other holder of the note, from the date the ED first reported the account to a credit bureau [20 U.S.C. 1087cc(c)(3)].

MAXIMUS00168

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

- - -

DONNA M. BECK, on behalf  :  CIVIL ACTION NO.: 04-2199
OF HERSELF AND ALL OTHERS :
SITUATED,                 :
                          :
          Plaintiff,      :  Class Action
                          :
             vs.          :
                          :
MAXIMUS, INC.             :
                          :
          Defendant.      :  Jury Trial Demanded

- - -

Philadelphia, Pennsylvania

Thursday, October 14, 2004

- - -

Oral deposition of DEBORAH WOLFF,

held at the Law Offices of Saul Ewing,

Center Square West, 1500 Market Street,

40th Floor, Philadelphia, Pennsylvania

19102, beginning at approximately 10:30

a.m., before Mary Hammond, a Certified

Professional Reporter and Notary Public.

- - -

KAPLAN, LEAMAN & WOLFE
The Bourse Building, Suite 970
111 South Independence Mall East
Philadelphia, Pennsylvania  19106
(215) 922-7112

```
 1   A-P-P-E-A-R-A-N-C-E-S

 2           LAW OFFICES OF SAUL EWING, LLP
             BY:   JAMES A. KELLER, ESQUIRE
 3           1500 Market Street
             Center Square West
 4           34th Floor
             Philadelphia, Pennsylvania   19102
 5           (215) 972-1964
             Counsel for Defendant, Maximus, Inc.
 6

 7           FRANCIS & MAILMAN, P.C.
             BY:   JAMES A. FRANCIS, ESQUIRE
 8           Land Title Building
             100 South Broad Street
 9           19th Floor
             Philadelphia, Pennsylvania   19110
10           (215) 735-8600
             Counsel for Plaintiff, Donna M. Beck
11

12           DONOVAN & SEARLES, LLC
             BY:   DAVID A. SEARLES, ESQUIRE
13           1845 Walnut Street
             Suite 1100
14           Philadelphia, Pennsylvania   19103
             (215) 732-6067
15           Counsel for Plaintiffs, All Others Situated

16

17

18

19

20

21

22

23

24
```

1                          —   —   —

2                        PROCEEDINGS

3                          —   —   —

4                (It is hereby stipulated and agreed

5           by and between counsel that signing,

6           sealing, filing and certification are

7           waived; and that all objections, except

8           as to the form of questions, be reserved

9           until the time of trial.)

10                         —   —   —

11               DEBORAH WOLFF, after having been

12          duly sworn, was examined and testified

13          as follows:

14                         —   —   —

15                   DIRECT EXAMINATION

16                         —   —   —

17   BY MR. FRANCIS:

18   Q.    Good morning.

19   A.    Hi.

20   Q.    Would you please state and spell your last

21   name for the record?

22   A.    Deborah Wolff, D-E-B-O-R-A-H, W-O-L-F-F.

23   Q.    Ms. Wolff, my name is Jim Francis.  I'm an

24   attorney, and I represent a woman by the name of

1    A.    Generally, that would be the information

2    technology group.

3    Q.    Okay.   Does the information technology group

4    include employees who are engaged in collection

5    activities?

6    A.    No.

7    Q.    What does the information technology group

8    do at the company?

9    A.    They develop the systems needed to interface

10   with our collection clients, so we're taking data

11   from the clients.   On some contracts we're pushing

12   data back to the clients after we updated after

13   the collectors actually put notations in or do

14   something or collections come in.   They keep the

15   phone system running, develop the queues for the

16   phone systems that -- you know, those type of

17   things, network our servers together.

18   Q.    Okay.   So, basically, it's the technology

19   end of carrying out the collection activities?

20   A.    That's absolutely correct.

21   Q.    As part of your duties and responsibilities,

22   have you had any input in the company's policies

23   or procedures for complying with the Fair Debt

24   Collection Practices Act?

1   A.      In my HR role, I do kind of insure that that

2   training is included in that -- in the training

3   manual.  I am the person who signed us up for the

4   American Collectors Association, and pass on

5   information from them when there are law changes,

6   like when the states, for instance, become more

7   strict than the FDCPA, those type of things.

8   Q.    Is there somebody who occupies a position

9   where it's one of their primary responsibilities

10  to oversee and/or direct FDCPA compliance?

11  A.    Not that I know of.

12  Q.    Is there somebody who is more responsible

13  for implementing designing or carrying out

14  compliance policy at Maximus?

15          MR. KELLER:  Just one second, are

16            you talking now, Jim, or back at the

17            pertinent time frame for this case or

18            both?

19          MR. FRANCIS:  Both.

20  BY MR. FRANCIS:

21  Q.    At any time.

22  A.    Someone that's more responsible than I am?

23  Q.    Yes.

24  A.    It would be the project manager of whatever

DEBORAH WOLFF

```
1    BY MR. FRANCIS:

2    Q.    Do you know if a credit report was accessed

3    in connection with Maximus' collection attempts to

4    collect this debt that belonged to Donna Beck?

5    A.    Yes, it did.

6    Q.    And that would be right at the time the

7    account was placed?

8    A.    Yes.

9    Q.    And does the company have procedures to make

10   sure that the person that they're trying to

11   collect from is right person?

12   A.    Yes.  We do -- the entire collection

13   industry does.  It is -- it is our basic procedure

14   when we're speaking to someone to not to speak to

15   someone unless they validated the last four digits

16   of their Social Security number.

17   Q.    Okay.  How would that be done, how would the

18   Social Security number be validated?

19   A.    If you have someone on the phone, like

20   you've made a collection call, and you say is this

21   Tom Smith and they say, yes, it is, then your next

22   question is, could you please validate the last

23   four digits of your Social Security number.

24   Q.    Okay.
```

1  A.     If they won't do that or they don't or it's

2  different, then we don't speak to them.

3  Q.     Okay.  And do you know if that was done in

4  this situation?

5  A.     Which situation, which contact would we be

6  talking about?

7  Q.     The collection of this debt that led to the

8  sending of the letter to Inolex?

9                    MR. KELLER:  I object to the form

10             of the question.

11                   THE WITNESS:  I can't personally

12             testify that that was done.  You know, I

13             know that that's our policy to do that.

14             So my assumption would be that it was.

15  BY MR. FRANCIS:

16  Q.     That at some point somebody --

17  A.     You're talking about contact with the Donna

18  Beck who owe the debt?

19  Q.     Yes, whoever --

20  A.     Yes.

21  Q.     -- somebody.  Some contact was made to

22  verify these last four digits of a Social Security

23  number?

24  A.     Yes.

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

— — —

DONNA M. BECK, on behalf          :   CIVIL ACTION NO.: 04-2199
OF HERSELF AND ALL OTHERS  :
SITUATED,                                       :
                                                      :
            Plaintiff,                     :   Class Action
                                                      :
                  vs.                           :
                                                      :
MAXIMUS, INC.                             :
                                                      :
            Defendant.                   :   Jury Trial Demanded

— — —

Philadelphia, Pennsylvania

Friday, October 15, 2004

— — —

Oral deposition of CHRISTOPHER

WOODS, held at the Law Offices of Saul

Ewing, Center Square West, 1500 Market

Street, 40th Floor, Philadelphia,

Pennsylvania 19102, beginning at

approximately 11:00 a.m., before Mary

Hammond, a Certified Professional

Reporter and Notary Public.

— — —

KAPLAN, LEAMAN & WOLFE
The Bourse Building, Suite 970
111 South Independence Mall East
Philadelphia, Pennsylvania  19106
(215) 922-7112

```
 1   A-P-P-E-A-R-A-N-C-E-S

 2           LAW OFFICES OF SAUL EWING, LLP
             BY:  JAMES A. KELLER, ESQUIRE
 3           1500 Market Street
             Center Square West
 4           34th Floor
             Philadelphia, Pennsylvania  19102
 5           (215) 972-1964
             Counsel for Maximus, Inc.

 6

 7           FRANCIS & MAILMAN, P.C.
             BY:  JAMES A. FRANCIS, ESQUIRE
 8           Land Title Building
             100 South Broad Street
 9           19th Floor
             Philadelphia, Pennsylvania  19110
10           (215) 735-8600
             Counsel for Donna M. Beck
11

12           DONOVAN & SEARLES, LLC
             BY:  DAVID A. SEARLES, ESQUIRE
13           1845 Walnut Street
             Suite 1100
14           Philadelphia, Pennsylvania  19103
             (215) 732-6067
15           Counsel for All others situated

16

17

18

19

20

21

22

23

24
```

```
 1                    -   -   -

 2                PROCEEDINGS

 3                    -   -   -

 4          (It is hereby stipulated and agreed

 5      by and between counsel that signing,

 6      sealing, filing and certification are

 7      waived; and that all objections, except

 8      as to the form of questions, be reserved

 9      until the time of trial.)

10                    -   -   -

11          CHRISTOPHER WOODS, after having

12      been duly sworn, was examined and

13      testified as follows:

14                    -   -   -

15                DIRECT EXAMINATION

16                    -   -   -

17  BY MR. FRANCIS:

18  Q.    Mr. Woods, good morning.  Would you please

19  state and spell your full name for the record?

20  A.    Christopher Woods.  C-H-R-I-S-T-O-P-H-E-R,

21  W-O-O-D-S.

22  Q.    I am Jim Francis.  I am an attorney, and I

23  represent a woman by the name of Donna Beck in a

24  case brought against the company by the name of
```

1   some of your calls with Inolex?

2   A.    No.

3   Q.    All right. And as a collection specialist

4   at Maximus back in around the time period of

5   April 2003, were you familiar with the company's

6   procedures and policies for complying with the

7   Fair Debt Collection Practices Act?

8   A.    Familiar, yes.

9   Q.    And at least with regard to your activities

10  concerning Donna Beck and the student loan that

11  you were collecting on, is it your testimony today

12  that your activities were consistent with those

13  policies?

14  A.    Correct.

15  Q.    After you joined Maximus in January of 2001,

16  did you receive any type of training regarding

17  FDCPA or the Fair Debt Collection Practices Act?

18  A.    Correct.

19  Q.    Can you tell me about the training you

20  received? How did you receive it? Was it

21  lectures, seminars, materials?

22  A.    Seminars, lectures and materials and

23  testing.

24  Q.    And do you know if any of those -- any of

1   that training included instruction on the Fair

2   Debt Collection Practices Acts restrictions on

3   communications with third parties about someone's

4   debt?

5   A.    Yes.

6   Q.    And you are aware, as you sit here today,

7   that the Fair Debt Collection Practices Act does

8   restrict to some degree the types of

9   communications that a collector can have with

10  third parties about the consumer's debt?

11  A.    Correct.

12  Q.    Prior to leaving the employ of the company

13  in October of 2004, had you ever been reprimanded

14  or disciplined by anybody at Maximus based upon

15  anything that you did concerning collecting an

16  account?

17              MR. KELLER:  Object to form, only

18         that I think you misspoke.  You said

19         October 2004 when you meant August 2004.

20              MR. FRANCIS:  I meant August 2004,

21         correct.

22              THE WITNESS:  Say that one were

23         more time.

24              MR. FRANCIS:  Yes.

1    A.    Correct.

2    Q.    Yes?

3    A.    Yes.

4    Q.    And statements that you had made to debtors?

5    A.    Yes.

6    Q.    Yes.  And would you say this occurred on a

7    daily basis through your entire employment at

8    Maximus?

9    A.    We have continuous training.  It would not

10   be a daily basis for me personally, but if

11   somebody else would have a problem, we would also

12   discuss it.  So it was continuous training.

13   Everybody was learning this job.  We all started

14   day one without a collection of this type in Grand

15   Rapids at all.

16   Q.    Did you ever receive any type of reprimand

17   or censure or correction suggested by one of the

18   project managers regarding going about getting an

19   employment verification request processed?

20   A.    On paper?

21   Q.    Either way, on the phone or on paper?

22   A.    No.  You mean a disciplinary action on paper

23   or verbal?

24   Q.    Either one.

# EXHIBIT G

ORIGINAL

1                    UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4      DONNA M. BECK              ) CIVIL ACTION

5           vs.                   )

6      MAXIMUS, INC.              ) NO. 04-2199

7

8                    ------------------------

9                        AUGUST 20, 2004

10                   ------------------------

11

12                    Oral sworn deposition of

13     KATHERINE DEMKO was taken at the law offices of SAUL

14     EWING, LLP, Centre Square West, 1500 Market Street,

15     36th Floor, Philadelphia, Pennsylvania, before Beth

16     A. Barkocy, Certified Shorthand Reporter and Notary

17     Public, on the above date, commencing at 9:39 a.m.

18

19

20

21

22                         - - -

23            LEN EPSTEIN COURT REPORTING ASSOCIATES

24              CERTIFIED SHORTHAND REPORTERS

25            (856) 874-0088       (215) 922-7366

2

1    A P P E A R A N C E S :

2

3        FRANCIS AND MAILMAN, PC

4        BY:   JAMES A. FRANCIS, ESQUIRE

5        Land Title Building, 19th Floor

6        100 South Broad Street

7        Philadelphia, Pennsylvania     19110

8        Attorneys for the Plaintiff

9

10       SAUL EWING, LLP

11       BY:   JAMES KELLER, ESQUIRE

12       Centre Square West

13       1500 Market Street, 36th Floor

14       Philadelphia, Pennsylvania     19102

15       Attorneys for the Defendant

16

17

18

19

20

21

22

23

24

25

KATHERINE DEMKO

4

```
1              (By agreement of counsel, the

2    certification, sealing, and filing of the deposition

3    were waived, and all objections except as to the form

4    of the question were reserved to the time of trial.)

5

6                        - - -

7

8                        KATHERINE DEMKO,

9          having been duly sworn, was examined

10             and testified as follows:

11   BY MR. KELLER:

12        Q      Good morning, Ms. Demko.  Thanks for

13   coming in.  My name is Jim Keller, and I represent a

14   company called MAXIMUS.  You've also met Mr. Francis,

15   and he represents Donna Beck in a lawsuit that's been

16   filed here in Philadelphia.

17             Prior to appearing today, did you

18   receive a subpoena compelling your attendance?

19        A      Yes, I did.

20        Q      Did you also receive a notice of the

21   deposition confirming the deposition would take place

22   this morning?

23        A      Yes, I did.

24             MR. KELLER:  For the record, I'm

25   marking the notice of deposition and the subpoena as
```

KATHERINE DEMKO

47

1    the Social Security Number, found that it wasn't

2    Donna, wasn't my Donna, and I went, well, this isn't

3    -- they do not have the correct person.  I believe I

4    went to Donna and handed it to Donna and said, look,

5    I don't know if you've got an issue here or not, but

6    they've got your name and Social Security Number, and

7    I gave it to her.  I didn't keep a copy of it; I

8    didn't fill it out.

9         Q       Did you call the 800 number at the

10   bottom of the form to tell them --

11        A       No.

12        Q       -- you thought there was an issue?

13        A       No.

14        Q       Did you fax anything to the 800 number

15   at the bottom of the form to tell them you thought

16   there was an issue?

17        A       No, I didn't.

18        Q       What did you understand this document

19   to be when you received it; what did you think it

20   was?

21        A       That they were looking for a

22   verification request.

23        Q       Is that the kind of thing you get

24   routinely in your job?

25        A       Yeah, we do routinely get them.  The

KATHERINE DEMKO

48

1    only difference is there's nothing signed here.  It

2    certainly talks about dates of employment and what

3    their dollar per hour -- all those things.  That's

4    personal information, and there was no signed

5    document from her saying that she released this

6    information which typically when we do get these,

7    there will be something signed.

8         Q        When you typically get employment

9    verification request forms with the signature that

10   you described, do they ask questions about whether

11   the employee is working there?

12        A        Yes.

13        Q        Do they ask what kind of wage the

14   employee is making?

15        A        Yes.

16        Q        Do they ask when they've been hired

17   and if they've been fired?

18        A        Yes.

19        Q        Do they ask for an address for the

20   employee?

21        A        Sometimes, yes.

22        Q        Did you, at the time you received this

23   specific form from MAXIMUS, form an opinion as to why

24   this form was being sent beyond verifying employment,

25   if any?

KATHERINE DEMKO

49

```
 1          A      No.

 2          Q      Did you --

 3          A      I mean, beyond reading it says here

 4   it's the department of education.

 5          Q      When you read department of education,

 6   did you form any opinion or did you talk to Donna

 7   about what is this department of education issue?

 8          A      No.

 9          Q      Did you have any idea of why the

10   department of education might be seeking information

11   about a Donna Beck, whether or not it's the Donna

12   Beck who works for you?

13          A      No.

14          Q      Did you assume that it related to a

15   debt?

16          A      No, I did not.

17          Q      Prior to coming in today, did you talk

18   to Donna?

19          A      Yeah; yes.

20          Q      Did you tell her you were coming in

21   for a deposition?

22          A      Yes, I did.

23          Q      Did you discuss any specifics about

24   what you might say in the deposition?

25          A      No.  I only questioned what I might be
```